***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award. The Full Commission AFFIRMS with some modifications the Opinion and Award of Deputy Commissioner Glenn.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All the parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. The employer-employee relationship existed between plaintiff and defendant-employer at all relevant times herein.
3. At all times relevant, the carrier on the risk for defendant-employer was Travelers Insurance Company.
4. Stipulation #1, which consists of Industrial Commission forms, medical records, discovery responses, and other records, pages 1-246 and exhibits #1 through #32, was admitted into evidence at the hearing before the Deputy Commissioner.
5. The issues to be determined by the Commission are whether plaintiff developed an occupational disease as a result of her employment with defendant-employer, or whether she had an aggravation of a preexisting condition as a result of her employment with defendant-employer; and if so, to what, if any, benefits is plaintiff entitled to recover under the North Carolina Workers' Compensation Act.
 ***********
Based upon the competent, credible evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT *Page 3 
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 51 years old and previously worked at a retirement village assisting elderly patients. She also provided home care for her sister. Plaintiff is a high school graduate and obtained a Certificate in Child Care in March 2007. Plaintiff is left-hand dominant.
2. Plaintiff worked for defendant-employer from 1986 until October 6, 2006. Defendant-employer is in the business of manufacturing window seals for automobiles. During her employment, plaintiff worked as a machine operator on a variety of different machines. In her last years at the plant, all of the assignments were production jobs with quotas for the number of parts to be manufactured each day.
3. Plaintiff first had problems with her hands in 1996, when she was diagnosed with carpal tunnel syndrome. Defendant-employer paid for plaintiff's treatment on that occasion.
4. In 2002 plaintiff again developed problems with her hands. Plaintiff was diagnosed as having left trigger thumb, carpal tunnel syndrome and cervical disk disease. Plaintiff was doing mold and trim work for defendant-employer at the time. Defendants accepted the carpal tunnel syndrome as a compensable condition as reflected in I.C. File No. 303416. The cervical disk disease was never accepted or found to be a compensable condition.
5. Plaintiff was treated by Dr. Hector Pedraza at Goldsboro Orthopaedic and had surgery on the left hand for the carpal tunnel syndrome and trigger finger in early 2003.
6. After the surgery, plaintiff was given permanent restrictions that she be alternated in her job at work to try to avoid doing the same motion at work all day long which would most likely cause recurrent symptoms. Dr. Pedraza specifically recommended no mold work.
7. Plaintiff had residual problems with the left hand after the carpal tunnel and trigger finger surgeries. She still had some swelling and tenderness. Plaintiff was paid on a *Page 4 
Form 21 for the 6% permanent functional impairment to the left hand for the carpal tunnel syndrome.
8. Plaintiff continued to experience neck and right arm pain related to her non-compensable cervical disk disease, and in April 2004 had neck surgery. She stayed out of work approximately six months. By October 2004 plaintiff was not having any significant problems with her neck and arms.
9. Plaintiff returned to work for defendant-employer operating a notch machine and a bend saw machine. After returning to work, her hands began tingling and swelling. Both machines required plaintiff to use her hands to pick up lightweight parts, turn and inspect them, insert them into a machine for notching or sawing, and remove and load the parts. This work cycle was repeated at approximately 150 pieces per hour and involved repeated pressing and grasping with the fingers and flexing and bending of the wrist.
10. On July 6, 2005, plaintiff reported her hand problems to Dr. K. Stuart Lee, the neurosurgeon who had done her neck surgery. Dr. Lee was of the opinion that the symptoms were not related to plaintiff's cervical disk disease or surgery.
11. In September 2005, plaintiff was moved to a different area of the plant working on parts for the F150 Ford truck. For a period of approximately one to two months plaintiff operated a notch machine. Plaintiff also occasionally built inserts for packing boxes and applied slip coat to parts. Plaintiff's hand symptoms continued while she was doing this assignment.
12. Operation of the notch machine required plaintiff to use her hands in a repetitive manner with a work cycle of approximately 70 to 90 cycles per hour. The notch machine job required plaintiff to repeatedly grip, bend and flex her hands in order to grasp and manipulate lightweight parts, spray parts with her left hand, and operate the machine. *Page 5 
13. Plaintiff was also reassigned to work on the bracket machine, after which plaintiff began having more pain and symptoms of numbness. Operating the bracket machine required plaintiff to use her hands in a repetitive manner with a work cycle of approximately 250 cycles per hour and required repeated gripping, bending and flexing her hand in order to grasp and manipulate parts and operate the machine.
14. As a result of her ongoing problems, plaintiff saw Dr. Pedraza on October 3, 2005 at which time she complained of numbness in her left hand and pain her upper arm. Dr. Pedraza referred her back to Dr. Daniel Poole, a neurologist, for an MRI and nerve conduction testing.
15. Plaintiff was also seen by Dr. Lee, her neck surgeon, in October 2005 due to increased pain in her neck. Dr. Lee felt the neck pain was caused by plaintiff's having to look down frequently while performing her job duties. Dr. Lee gave plaintiff permanent restrictions for her neck of no lifting more than 25 pounds.
16. Plaintiff's doctors determined that plaintiff was suffering from a mild persistent left median neuropathy, or carpal tunnel syndrome, with no evidence of cervical radiculopathy. The lump at her elbow and upper arm discomfort was caused by a dilated venous structure. The numbness in her left hand was recurrent carpal tunnel syndrome.
17. Plaintiff advised defendants of her diagnoses and they declined to provide any treatment or other benefits.
18. Dr. Pedraza's medical notes from October 2005 to January 2006 indicated that plaintiff was to return to work regular duty. However, Dr. Pedraza never lifted her permanent restrictions from 2003 and those restrictions remained in place. The referral to working "regular duty" meant that plaintiff did not have restrictions in addition to those already given. *Page 6 
19. In mid-2006, defendant-employer changed its policy so that employees on permanent work restrictions who were unable to perform their regular job duties would be terminated. The new policy required all employees to be able to rotate into all jobs. As a result of this policy change, plaintiff was laid off from her job on October 6, 2006. Defendant-employer selected plaintiff for layoff because of her permanent work restrictions.
20. At the time of the layoff, plaintiff was still on permanent restrictions for her carpal tunnel syndrome.
21. After losing her job, plaintiff continued to experience symptoms in her left hand, including numbness, tingling and swelling.
22. On April 26, 2007, plaintiff returned to Dr. Pedraza. Dr. Pedraza continued to believe that plaintiff had carpal tunnel syndrome and referred her back to Dr. Poole for further testing and possible surgery. Dr. Poole saw plaintiff May 2, 2007. Dr. Poole also was of the opinion that plaintiff had carpal tunnel syndrome and recommended use of a left wrist brace at night. Plaintiff has not had medical care for her hand since that time and continues to have symptoms.
23. At his deposition Dr. Pedraza testified and the Full Commission finds that plaintiff's job duties in the bracket and notch jobs were a significant contributing factor in the recurrent development of plaintiff's carpal tunnel syndrome. The cause of plaintiff's carpal tunnel symptoms was inflammation of the tendon sheath which put pressure on the nerve and resulted in the development of flexor tenosynovitis.
24. William McClure is an ergonomics expert with Hand and Rehabilitation Specialists of North Carolina. Mr. McClure performed an ergonomic evaluation of the notch and bracket positions in 2008 after plaintiff was no longer working for defendant-employer. Mr. McClure's *Page 7 
observations about how the jobs were done were substantially similar to what plaintiff described.
25. Mr. McClure testified and the Commission finds that the bracket operator and notch operator positions placed plaintiff at an increased risk of developing cumulative trauma disorders, including carpal tunnel syndrome. According to Mr. McClure, the work cycle time was repetitive because it exceeded the rest cycle time, based on the total duration of the required tasks.
26. In late 2005 or early 2006 plaintiff contracted a compensable occupational disease of tenosynovitis caused by repeated strain or stress on the tendons in her left hand. Plaintiff also developed carpal tunnel syndrome which was causally related to her job duties with defendant-employer. Plaintiff's job duties placed her at an increased risk for developing carpal tunnel syndrome.
27. Plaintiff has received unemployment benefits at the rate of $257.00 per week.
28. After being laid off, plaintiff immediately began looking for work. For most of the period that she has looked for work, plaintiff maintained job search logs. Her job search logs go from May to December 2007, but she looked for work through the entire period since her lay-off, except for a one-month period in approximately January 2008, after she had a hip surgery. Plaintiff regularly contacted employers to try to find work at the rate of several contacts each week. Plaintiff's job search included searching the newspaper, sending in applications, searching for computer job listings with help from the ESC staff or friends, looking at the library, making cold calls and visits to employers, looking on the internet and getting leads from family and friends. Plaintiff inquired about a wide variety of jobs. Plaintiff has looked for work in Goldsboro and in the surrounding area, including Wilson and Mt. Olive. *Page 8 
29. Despite regularly looking for work, plaintiff had been unable to find employment through the date of the hearing before the Deputy Commissioner.
30. Defendant-employer has not offered plaintiff any work since October 6, 2006, nor have they attempted to assist plaintiff in finding any other employment.
31. Plaintiff's work background consisted of doing child care, working as an assistant at a retirement village, and factory work. After losing her job with defendant-employer, plaintiff enrolled in a community college program to earn a degree in early childhood education.
32. Plaintiff's permanent work restrictions remain in effect and were in effect as of October 2006 when she was laid off.
33. Plaintiff is not at maximum medical improvement and would benefit from additional medical care for her left hand. The care given by Dr. Pedraza and Dr. Poole from 2005 to 2007 was reasonable and appropriate.
34. Defendants submitted a Form 22 based on a date of injury of January 24, 2006. The Form 22 covers the period from February 1, 2005 to January 28, 2006, shows total wages of $26,186.94, and shows an eight-day block in late April 2005 when plaintiff did not work at all, which indicates that plaintiff's average weekly wage at the time of her January 2006 claim was $513.47 per week, yielding a compensation rate of $343.33 per week.
 ***********
Based upon the above Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's recurrent carpal tunnel syndrome, diagnosed in late fall 2005 is a compensable occupational disease. Plaintiff's carpal tunnel syndrome is a tenosynovitis caused by trauma in the employment and is a listed occupational disease. N.C. Gen. Stat. § 97-53(21); *Page 9 Henry v. A.C. Lawrence Leather Co.,234 N.C. 126, 66 S.E.2d 693 (1951). In addition, plaintiff's carpal tunnel syndrome is compensable under N.C. Gen. Stat. § 97-53(13), in that her work activities caused or significantly contributed to its development and placed her at increased risk of developing the condition over members of the general public. Rutledge v. Tultex,308 N.C. 85, 301 S.E.2d 359 (1983).
2. Plaintiff became totally disabled as a result of her compensable carpal tunnel syndrome on October 6, 2006, when defendants terminated her based on her permanent work restrictions for the carpal tunnel syndrome. Plaintiff's lost earnings as of that date were due to her disability arising from her compensable carpal tunnel syndrome, and not some other reason. Plaintiff has remained disabled from October 6, 2006 through the date of the hearing before the Deputy Commissioner in that the evidence establishes that she performed a reasonable job search and, despite her job search, was unable to find suitable employment. Defendants did not offer evidence plaintiff was offered, or actually could have found, suitable work within her restrictions. Hilliard v. ApexCabinet Co., 305 N.C. 593, 593, 290 S.E.2d 682, 683 (1982);Russell v. Lowes Products,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993); Kennedy v.Duke Univ. Med. Ctr.,101 N.C.App. 24, 33, 398 S.E.2d 677, 682 (1990).
3. As a result of the compensable occupational disease, plaintiff was totally disabled from any employment and is entitled to payment by defendants of total disability compensation at the rate of $343.33 per week from October 6, 2006 through December 31, 2007, and from February 1, 2008 continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to payment by defendants of compensation for past and future medical expenses necessary to treat her compensable carpal tunnel syndrome. N.C. Gen. Stat. §§ 97-25, 97-25.1. *Page 10 
5. Defendants are entitled to a credit for unemployment benefits received by plaintiff after October 6, 2006. N.C. Gen. Stat. § 97-42.1.
 ***********
Based on the Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fees approved below, defendants shall pay to plaintiff total disability benefits at the rate of $343.33 per week for the periods from October 6, 2006 through December 31, 2007, and from February 1, 2008 through to the present, and continuing until such time as plaintiff returns to work at her pre-injury wage or until further Order by the Commission. Defendants shall be entitled to reduce the total disability benefits paid on a week-by-week basis by the amount of unemployment benefits received by plaintiff. All sums that have accrued shall be paid to plaintiff in a lump sum.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable occupational disease for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. A reasonable attorney's fee in the amount of 25% of the compensation awarded in Paragraph 1 above is approved for plaintiff's counsel. The attorney's fee shall be deducted from the compensation due plaintiff and shall be paid directly to plaintiff's attorney.
4. Defendants shall pay the costs of this action.
This 4th day of February, 2010. *Page 11 
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1